**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 21, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOE DEHERRERA, a/k/a Joe "J.R."
Deherrera; JOE GRIEGO; JENNIFER
JOHNSON; SCOTT JOHNSON; TOM
LARK, on behalf of themselves,
individually, and on behalf of all others
similarly situated,

      Plaintiffs - Appellants,

v.

DECKER TRUCK LINE, INC,

      Defendant - Appellee.

No. 15-1220

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:13-CV-02556-RM-KLM)**
_____

David H. Miller (Rachel Graves with him on the briefs), The Sawaya & Miller Law Firm,
Denver, Colorado, for Plaintiffs-Appellants.

Emily F. Keimig (Matthew M. Morrison with her on the brief), Sherman & Howard,
L.L.C., Denver, Colorado, for Defendant-Appellee.
_____

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

## I.  INTRODUCTION

This case involves a dispute over the scope of the Motor Carrier Act exemption from the overtime pay requirements of the Fair Labor Standards Act (FLSA) and the Colorado Minimum Wage Order (Wage Order). Joe Deherrera and several other complainants (Plaintiffs), who were commercial truck drivers for Decker Truck Line, Inc. (Decker), claim Decker failed to pay them proper overtime wages. Decker contends Plaintiffs were exempt employees under both the FLSA and the Wage Order. The district court granted summary judgment to Decker, and we affirm. By driving an intrastate leg of shipments in interstate commerce, Plaintiffs became subject to the authority of the Secretary of Transportation and were thus exempt from the overtime pay requirements of the FLSA and the Wage Order.

## II.  BACKGROUND

### A.  *Facts*[1]

Decker is a for-hire motor carrier, regulated by the U.S. Department of Transportation (USDOT) and the Secretary of Transportation, with its principal office in Fort Dodge, Iowa. Decker signed a transportation contract with New Belgium Brewing Company (New Belgium) to make two classes of shipments: (1) outbound shipments of beer from New Belgium's brewery to its warehouse (known as the "Rez"), and (2) backhaul shipments of empty kegs, pallets, hops, and other

---

[1] "In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party, as is appropriate when reviewing a grant of summary judgment." *Weigel v. Broad*, 544 F.3d 1143, 1147 (10th Cir. 2008) (quoting *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1200 n.1 (10th Cir. 2006)).

materials from the Rez to the brewery. These two facilities are located approximately five miles apart in Fort Collins, Colorado. And Decker employed Plaintiffs (all of whom are commercial truck drivers) to transport both categories of shipments.[2]

New Belgium sells its beer primarily through distributors located outside the State of Colorado. To determine the composition and volume of the outbound shipments, New Belgium uses a forecast that accounts for historical demand and pending customer orders. This process requires its distributors to place orders at least 21 days before shipment, but New Belgium allows the distributors to modify their orders up until the time of shipment if New Belgium can satisfy the production request. At the time these orders are placed, the distributors also generally designate which carrier will retrieve the shipment from the Rez. In a number of cases, New Belgium arranges the carrier as a "value-added service" to the goods they provide. New Belgium then prepares a monthly schedule showing what beer will be brewed and packaged on each day of the month.

Because New Belgium lacks sufficient refrigerated storage at its brewery, Decker's drivers (including Plaintiffs) transport approximately 99 percent of the beer New Belgium produces from the brewery to the Rez. The rest remains on-site for local sales. New Belgium tracks the content of these shipments by affixing "license plates" to each pallet and logging each one using modern tracking software. Upon arrival at the Rez, approximately 10% of beer is repackaged, but most of it is left

---

[2] Plaintiffs were also required, at least by virtue of Decker's contract with New Belgium, to comply with the USDOT's federal motor carrier safety regulations (FMCSRs), including mandatory pre-trip safety inspections.

undisturbed. New Belgium then exercises complete control over the beer until carriers retrieve the product from the Rez at the designated date and time for delivery to the distributors.

On average, beer remains at the Rez for two weeks before it is shipped to New Belgium's customers. But on occasion some beer is never stored at the warehouse. Instead, it is shipped from the brewery to the Rez, scanned into the Rez's inventory, and then loaded directly into an outbound truck. It is unclear whether these particular trucks then make intrastate or interstate deliveries. But overall, of the beer that Plaintiffs transported to the Rez in November 2013, roughly 86 percent was later shipped to locations outside of Colorado. That figure rose to 89 percent in February 2015. For all shipments, New Belgium has a "first-in/first-out" policy which means that the first beer to come into the Rez is the first beer to leave the Rez. New Belgium also places a "best by" date on its beer and assures its customers that it will not ship beer to them with less than sixty days remaining before that date. Beer that is too close to the best by date is discarded.

Plaintiffs' backhaul shipments take a different form. After delivering beer to the Rez, Decker's drivers then load empty kegs, pallets, hops, and other materials from the Rez onto their trucks and haul them back to the brewery. Distributors receive $30 and $7, respectively, for each keg and pallet returned to New Belgium. It is unclear whether New Belgium arranges for the kegs and pallets to be returned or whether the distributors handle that responsibility entirely. Regardless, most of these backhaul materials arrive at the Rez from locations outside the state.

4

## B. *Proceedings Below*

Plaintiffs allege that in making these shipments for Decker, they were required to work overtime hours but were not given overtime pay as required under the FLSA and the Wage Order. Specifically, Plaintiffs allege they worked a repeating schedule, one week working 4 days with shifts of 12 hours and 15 minutes, followed by another week working 3 days with shifts of 12 hours and 15 minutes. Plaintiffs first claim a violation of the FLSA for failure to pay overtime wages. Plaintiffs' second cause of action alleges Decker violated the Wage Order because they (1) were not paid overtime when working 12-hour shifts, (2) were not given paid breaks, (3) worked off the clock for 15 minutes each day, and (4) were not paid overtime when working over 40 hours during a work week.

Plaintiffs filed an amended complaint against Decker in federal court on September 19, 2013, incorporating both causes of action. On November 20, 2013, Decker filed a motion to dismiss, asserting the court lacked subject-matter jurisdiction and Plaintiffs had failed to state a claim. The district court denied the motion and opened the case for limited discovery on whether Plaintiffs were exempt employees under the FLSA and the Wage Order.

Decker then filed a motion for summary judgment on February 9, 2015, arguing Plaintiffs moved goods in "interstate commerce" and were thus exempt from the overtime provision under the FLSA. Decker also argued that Plaintiffs were not "equipment operat[ors]" and did not belong to any of the industries covered by the Wage Order. The district court granted Decker's motion on June 10, 2015.

5

In its decision, the court laid out the "Undisputed Facts" and the "Disputed Facts." With respect to the latter, the court noted that "[t]he parties hotly dispute[d]" whether in a separate adjudication before the NLRB the Plaintiffs had admitted to being subject to regulation by the USDOT. But the court ultimately decided resolution of that issue was "not necessary to [the] resolution of the motion" and granted summary judgment on the basis of the undisputed facts alone.

As to Plaintiffs' FLSA claim, the district court determined Plaintiffs were engaged in interstate commerce based entirely on their backhaul shipments of materials from the Rez to the brewery. The court concluded these shipments were "clearly sufficient to place plaintiffs in interstate commerce and under the authority of the Secretary of Transportation which in turn, exempts plaintiffs from the overtime provision of the FLSA." As to Plaintiffs' claim under the Wage Order, the court agreed with Decker that Plaintiffs were not "equipment operators" and were exempt from the provisions of the Wage Order as "interstate drivers." The district court entered final judgment in Decker's favor, and Plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III. DISCUSSION

In affirming the district court's grant of summary judgment, we first analyze the scope of the Motor Carrier Act (MCA) exemption to the FLSA and conclude—based on the undisputed facts—that Plaintiffs' backhaul shipments of hops, pallets, empty kegs, and other materials took place in interstate commerce. As a result, Plaintiffs were exempt from the FLSA's overtime provisions. Because Plaintiffs were

6

engaged in interstate commerce, we also conclude they were "interstate drivers" under the Wage Order and therefore exempt from its overtime provisions as well. Accordingly, we affirm the district court's grant of summary judgment in favor of Decker on both claims.

## A. *Standard of Review*

"We review summary judgment orders de novo and may affirm the district court's grant of summary judgment on any grounds adequately presented below." *Reinhart v. Lincoln Cty.*, 482 F.3d 1225, 1228 (10th Cir. 2007) (brackets omitted) (quoting *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992)). As defendant, Decker "is entitled to summary judgment if it 'raises at least one legally sufficient defense that would bar plaintiff's claim and that involves no triable issue of fact.'" *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1232–33 (10th Cir. 2008) (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2734 (3d ed. 1998)). Here, Decker's defense is that the overtime provisions of the FLSA do not apply because Plaintiffs fall under the MCA exemption. Because FLSA exemptions are "narrowly construed against . . . employers," *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960), "in considering an FLSA exemption, a court must find that the claimed exemption falls 'plainly and unmistakably' within the terms of the statute," *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1157–58 (10th Cir. 2012). "Once a court finds the employer is eligible to claim the exemption, the factfinder reviews the disputed facts to determine if the exemption is met." *Id*. at 1158. Indeed, this exemption inquiry

7

"remains intensely fact bound and case specific." *Bohn v. Park City Grp., Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996) (quoting *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1226 (5th Cir. 1990)).

### B. *Plaintiffs' FLSA Claim*

Plaintiffs first challenge the summary judgment in favor of Decker on their FLSA claim because the district court failed to strictly adhere to a set of three factors promulgated by the Interstate Commerce Commission (ICC) and recognized by this court in *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670 (10th Cir. 1993). They claim these factors (known as the MC-48 test) compel the conclusion that the shipments between the Rez and the brewery did not take place in interstate commerce. We disagree. As our *Foxworthy* decision makes clear, we may consider a broader set of factors in deciding whether a shipment took place in interstate commerce than the three Plaintiffs cite from the MC-48 test. And as evidenced by the undisputed facts, Plaintiffs' backhauling of hops and other materials from the Rez to the brewery took place as part of those backhauled items' journey in interstate commerce. Summary judgment was therefore appropriate in favor of Decker on Plaintiffs' FLSA claim.

### 1. Scope of the MCA Exemption

Section 207 of the FLSA mandates that employers provide overtime pay to employees who work longer than forty hours in a given week. 29 U.S.C. § 207(a). But the FLSA also provides dozens of exemptions to the overtime rules. *Id*. § 213. One of these—the so-called MCA exemption—provides that the overtime pay requirement does not apply to "any employee with respect to whom the Secretary of

8

Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." *Id*. § 213(b)(1). In turn, the Secretary of Transportation has power over an employee of a private motor carrier like Decker only where "the employee in the performance of his duties moves goods in interstate commerce and affects the safe operation of motor vehicles on public highways." *Foxworthy*, 997 F.2d at 672.

Distilled down, the applicability of this exemption depends centrally on whether or not the employee was engaged in interstate commerce.[3] This court explained in *Foxworthy* that an employee engages in interstate commerce if his delivery "forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination." *Id.* (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)). In other words, an employee engages in interstate commerce where the "essential character" of the shipment is interstate in nature. *Id*. (quoting *Texas & New Orleans R.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 122 (1913)).

---

[3] This interstate commerce requirement is a result of the jurisdictional limits of the Secretary of Transportation's authority. The Secretary has power to establish "qualifications and maximum hours of service" over "employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2). "Motor private carrier," in turn, is defined as "a person . . . transporting property by motor vehicle when--(A) the transportation is as provided in section 13501 of this title; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." *Id*. § 13102(15); *see also id*. § 31501(2). And section 13501 sets the jurisdiction of the Secretary of Transportation, restricting it generally to only those forms of transportation taking place in interstate commerce. *Id*. § 13501.

For certain types of shipments, the interstate nature of the transportation can become blurred as products are temporarily warehoused or moved by various carriers—some of whom may only complete intrastate portions of the journey. The Supreme Court has repeatedly concluded that the character of these shipments may still be interstate in nature; indeed, "[t]he entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey." *Walling*, 317 U.S. at 568; *see Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 701 & n.2 (11th Cir. 1986) (in determining the meaning of "foreign commerce" under the FLSA, "[i]t is irrelevant that the foreign and domestic legs of the voyage are effected by different shippers or carriers"). To determine whether the essential character of these shipments remains interstate, courts must look to the shipper's "fixed and persisting intent" at the time of the shipment. *Foxworthy*, 997 F.2d at 672 (quoting *Int'l Bhd. of Teamsters v. ICC*, 921 F.2d 904, 908 (9th Cir. 1990)). Here, the focus of the parties' dispute is whether the shipper's "fixed and persisting intent" was to move the goods in interstate commerce.

This intent inquiry is "fixed" in the sense that courts must look to "the intended final destination of the transportation when that ultimate destination was envisaged *at the time the transportation commenced.*" *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 223–24 (2d Cir. 2002) (emphasis added) (internal quotation marks omitted); *accord Atl. Coast Line R. Co. v. Standard Oil Co. of Ky.*, 275 U.S. 257, 269 (1927) (asking whether the final destination of the shipment is "arranged for or fixed in the minds of the sellers" at the time the initial segment of

the journey commenced). And this intent "persists" from the moment "the goods enter[] the channels of interstate commerce . . . until their interstate journey [ends]," regardless of the number of carriers involved in the transportation. *See Walling*, 317 U.S. at 568; *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74–75 (2d Cir. 2001) ("Where multiple carriers are responsible for different legs of a generally continuous shipment," the intent at the time of departure "fixes the character of the shipment for all the legs of the transport within the United States.").

As the methods of warehousing and interstate commerce became increasingly complex, the ICC[4] grappled with the question of whether certain movements strip shipments of their interstate character. The ICC held extensive hearings and ultimately issued a set of guidelines, which were later codified and adopted by the Department of Labor (DOL). 29 C.F.R. § 782.7(b)(2); *see Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970). Under these guidelines—known as the MC-48 test—a "shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment" if all of the following criteria are met:

> (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and
> (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and
> (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

---

[4] The ICC was previously responsible for administering the MCA, but its responsibilities were in part later divested to the USDOT. See ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803.

11

29 C.F.R. § 782.7(b)(2). Plaintiffs argue that because this court applied these three factors in its *Foxworthy* decision, it is now bound to apply these factors—and *only* these factors—in ruling on the current dispute. But this argument misapprehends our *Foxworthy* decision and ignores the further refinement of the "fixed and persisting intent" inquiry adopted by the agencies responsible for applying the MCA exemption in subsequent decisions.

In *Foxworthy*, as in the present case, the plaintiff sued for overtime payments, claiming his purely intrastate transportation of goods placed him outside the MCA exemption to the FLSA. 997 F.2d at 671. There, the driver placed orders with Hiland Dairy Company, which then shipped those products across state lines from its Fort Smith, Arkansas processing plant to the driver's loading point in Ponca City, Oklahoma. *Id.* at 671–72. Before reaching Ponca City, the products were stored overnight in a refrigerated trailer in Oklahoma City. *Id.* The driver then loaded his products and made purely intrastate deliveries to customers, primarily composed of "Circle K" convenience stores. *Id.* at 672. Despite the temporary warehousing, this court noted that the products "were intended to be delivered to Circle K stores in Oklahoma *from the moment they were loaded* onto the truck" in Arkansas. *Id.* (emphasis added).

After each delivery, the driver would collect empty plastic crates from the customer, and those crates were later transported by a different carrier to the Arkansas processing plant. *Id.* at 672, 674. We ruled in *Foxworthy* that the fixed and persisting intent at the time the driver collected the empty crates was to have them

12

continue across state lines. Specifically, we reasoned that the crates were "indispensable to the processing procedures at the Arkansas plant." *Id*. at 672. Indeed, we concluded that this backhauling portion of the journey was, in itself, sufficient to place the driver in interstate commerce for purposes of the MCA exemption. *Id*. at 674. This was true even though the portion of that journey the driver completed was entirely intrastate. *Id.*

In analyzing the character of the outgoing shipments, the *Foxworthy* court applied the factors from the MC-48 test but did not constrain its analysis to those factors alone. *Id*. at 673–74. Instead, the court reviewed additional factors considered by a host of other circuits, including:

> the length of time movement of the product is interrupted by storage; whether the distribution center has a low "through-put" compared to its storage capability; whether the products are shipped on a "predetermined" ordering cycle; whether the carrier is in continuous possession of the product until delivery; whether the product is processed or commingled in any way at the storage location; whether the final destination is designated by the out-of-state shipper or by an instate intermediator; whether the goods were intended for particular customers; and whether temporary storage simply provides an efficient opportunity to convert the means of delivery from one form of transportation to another.

997 F.2d at 673 (collecting cases). After applying *all* of these factors—those from the MC-48 test and those identified by other circuits—this court concluded that the outgoing shipments in *Foxworthy* retained their interstate character, despite the temporary stop at the loading facility and the solely intrastate character of the driver's segment of that journey. *Id*. at 672–74.

13

Ours is not the only circuit to rely on factors beyond those identified in the MC-48 test in cases involving temporary warehousing of goods. Sister circuits have followed the ICC's own decision to depart from the strictures of the MC-48 test and to focus more broadly on "all the facts and circumstances surrounding the transportation." *Armstrong World Indus., Inc.-Transp. Within Texas-Petition for Declaratory Order*, 2 I.C.C.2d 63, 69 (1986); *accord Mena v. McArthur Dairy, LLC*, 352 F. App'x 303, 306 n.2 (11th Cir. 2009) (accord); *Int'l Bhd. of Teamsters*, 921 F.2d at 908 ("[I]t appears that [the ICC's] use of [the MC-48] standard has been refined, if not phased out." (quoting *Cal. Trucking Ass'n v. ICC*, 900 F.2d 208, 213 (9th Cir. 1990))); *Cent. Freight Lines v. ICC*, 899 F.2d 413, 421 (5th Cir. 1990) (noting "[the ICC] appears to have implicitly recharacterized the applicable test"); *Middlewest Motor Freight Bureau v. ICC*, 867 F.2d 458, 460 (8th Cir. 1989) (stating "there is no formula to apply in determining intent" but "intent should be determined from the facts and circumstances which surround the transportation").

Less than a year before *Foxworthy*, the ICC issued a new set of guidelines—known as the MC-207 test—to account for increased diversity in shipping methods. This test assesses a shipper's intent by looking to a broader set of factors. *Motor Carrier Interstate Transp. (Ex-Parte No. MC-207)*, 8 I.C.C.2d 470, 473–74 (1992); *see Musarra v. Dig. Dish, Inc.*, 454 F. Supp. 2d 692, 711 (S.D. Ohio 2006) ("[I]n the face of modern advancements and new shipping techniques, MC–48 is no[] longer sufficient to determine a shipper's intent accurately."). In particular, the ICC stressed through this new set of guidelines that a shipment's interstate character "is not

14

changed simply because the merchandise may move through a warehouse or terminal facility on the way to its ultimate destination." *Ex-Parte No. MC-207*, 8 I.C.C.2d at 472. If the warehouse "serves only as temporary storage to permit orderly and convenient transfer of goods in the course of what the shipper intends to be a continuous movement to destination, the continuity of the movement is not broken at the warehouse." *Id*. at 472–73.

Although we did not cite the ICC's MC-207 decision in *Foxworthy*, the analysis included an examination of circumstances beyond those set forth in MC-48. And a year after *Foxworthy*, the ICC expressly stated it was not bound by the strictures of the MC-48 test. *Advantage Tank Lines, Inc.*, 10 I.C.C.2d 64, 67 (1994) ("[T]he Commission is not bound in this case to apply the [MC-48] test . . . . Instead it must analyze the circumstances of this case in light of all the facts and circumstances surrounding the transportation."). Subsequently, in 2005, the DOL adopted the MC-207 test, bringing its approach into harmony with the USDOT. U.S. Department of Labor, Opinion Letter No. FLSA 2005-10, Intra/interstate Transportation of Gasoline and Section 13(b)(1) (Jan. 11, 2005) (citing 57 Fed. Reg. 19,812, 19,813 (1992)). Where DOL and USDOT are each charged with applying the FLSA exemption, their consistent interpretation of the term "interstate commerce" for purposes of that application "is entitled to great weight." *Boutell v. Walling*, 327 U.S. 463, 471 (1946); *Baird*, 425 F.2d at 411 ("[W]here the [DOL] and the [ICC] construe the FLSA and the MCA consistently, their construction 'is entitled to great weight.'" (quoting *Boutell*, 327 U.S. at 471)); *see also Finn v. Dean Transp., Inc.*, 53

15

F. Supp. 3d 1043, 1053–55 (M.D. Tenn. 2014) (explaining the history of MC-48 and MC-207).

In sum, *Foxworthy* does not exclusively bind us to the factors from the MC-48 test. First, this court in *Foxworthy* considered factors beyond those identified in MC-48. Second, after our decision in *Foxworthy*, the two agencies charged with interpreting the meaning of the MCA exemption reached consistent interpretations of interstate commerce which look to circumstances beyond those identified in MC-48. That harmonious interpretation is entitled to great weight. Thus, considering the facts and circumstances here, we agree with the district court that the Plaintiffs were engaged in interstate commerce when they transported backhaul shipments from the Rez to the brewery.

**2.    Plaintiffs' Participation in Interstate Commerce**

As in *Foxworthy*, the drivers here were responsible for one segment of a continuous interstate shipment of empty materials back to a processing facility. There is no dispute that the empty kegs, pallets, hops, and other materials arrived at the Rez primarily from out-of-state locations. Plaintiffs were then responsible for backhauling these materials from the Rez to the brewery. Furthermore, there can be no serious dispute that the final destination for these materials at the time of shipment was the brewery because all of these materials, and in particular, the hops, are "indispensable to the processing procedures" at New Belgium's brewery. *Foxworthy*, 997 F.2d at 672. The undisputed facts therefore establish that Plaintiffs completed the final

16

intrastate leg of the backhauled materials' intended journey across state lines, and summary judgment in favor of Decker on Plaintiffs' FLSA claim was appropriate.

Nevertheless, Plaintiffs claim summary judgment was improper because there was no direct evidence that the out-of-state shippers specifically intended for the backhauled materials to reach the brewery, rather than the Rez. On this point, Plaintiffs miss the mark. As we have detailed above, the crucial inquiry is whether the essential character of Plaintiffs' shipments was interstate in nature—or, stated otherwise, whether they "form[] a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination." *Id*. at 672 (quoting *Walling*, 317 U.S. at 568). Although warehousing goods may alter the character of an otherwise interstate shipment, the undisputed facts here compel the opposite conclusion.

On summary judgment, "[a]lthough we must draw all factual inferences in favor of the nonmovant, those inferences must be reasonable." *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997). And "[w]here only one inference could reasonably be drawn from the undisputed evidentiary facts, then summary judgment would be proper." *Empire Elecs. Co. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962). Here, the only "reasonable" inference from the undisputed facts is that the hops and other materials were bound for the brewery from the moment of their initial departure. As explained by the district court, "the practical realities of the business at hand and the character of the materials" necessitated their return to New Belgium's

17

brewery so New Belgium could continue its production of beer.[5] And New Belgium

contracted with Decker for this very purpose.

This court reached a similar conclusion in *Thomas v. Wichita Coca-Cola*

*Bottling Co.*, 968 F.2d 1022 (10th Cir. 1992). There, as in *Foxworthy*, the plaintiffs

were responsible for delivering products that had been shipped from an out-of-state

facility, temporarily warehoused, then picked up and delivered by the plaintiffs to

intrastate customers. *Id*. at 1024. The plaintiffs were also required to collect empty

product containers with each delivery, which were transported first to the warehouse,

and then shipped on a daily basis back to the out-of-state bottling facility. *Id*. The

*Thomas* court reviewed both types of shipments but ruled exclusively on the basis of

the backhaul shipments, concluding that these return shipments placed the plaintiffs

in interstate commerce. *Id*. at 1025–26. There, as here, the parties could not

*reasonably* dispute that the empty materials were bound for an out-of-state facility

from the moment of pickup.

Although Plaintiffs here completed the *last* leg of the backhaul shipments,

rather than the first, that distinction is irrelevant. "[I]f the final intended destination

at the time the shipment begins is another state, the [MCA] applies throughout the

shipment, even as to a carrier that is only responsible for an intrastate leg of the

---

[5] As the district court properly noted, it is irrelevant whether these backhaul shipments constituted a major portion of the Plaintiffs' workload, because even minimal loads in interstate commerce place employees within the MCA exemption to the FLSA. *Morris v. McComb*, 332 U.S. 422, 434 (1947) ("[T]here is the same essential need for the establishment of reasonable requirements with respect to qualifications and maximum hours of service of employees" even if a driver spends only "4% of his driving time each day in interstate commerce.").

18

shipment." *Project Hope*, 250 F.3d at 75. Accordingly, the interstate character of Plaintiffs' backhaul shipments placed Plaintiffs "plainly and unmistakably" under the authority of the Secretary of Transportation which exempts them from the overtime provisions of the FLSA. *Lederman*, 685 F.3d at 1158; *see also* 29 U.S.C. § 213(b)(1). We therefore affirm the grant of summary judgment in Decker's favor on Plaintiffs' FLSA claim.

## C. *Plaintiffs' Wage Order Claim*

We also affirm the grant of summary judgment in Decker's favor on Plaintiffs' Wage Order claim because, by engaging in interstate commerce, Plaintiffs are similarly exempt from the Wage Order's overtime provisions. The Wage Order "regulates wages, hours, working conditions and procedures for certain employers and employees for work performed within the boundaries of the state of Colorado" in certain industries, such as the "Retail and Service" and "Commercial Support Service" industries. 7 COLO. CODE REGS. § 1103-1:1. The Wage Order then defines each of these industries; the "Commercial Support Service" industry, for example, includes:

> any business or enterprise engaged directly or indirectly in providing services to other commercial firms through the use of service employees who perform duties such as: clerical, keypunching, janitorial, laundry or dry cleaning, security, building or plant maintenance, parking attendants, equipment operations, landscaping and grounds maintenance.

19

*Id.* § 1103-1:2(B). But the Wage Order separately provides that "interstate drivers, driver helpers, loaders or mechanics of motor carriers, [and] taxi cab drivers" "are exempt from all provisions of [the Wage Order]." *Id*. § 1103-1:5.

The district court concluded by way of its FLSA analysis that Plaintiffs were exempt employees under the Wage Order but that it was "unlikely that the legislature desired to include motor carrier drivers transporting interstate goods" within the "vague category of equipment operators." Plaintiffs argue this conclusion was erroneous because truck driving is considered a "Commercial Support Service"—in particular, "equipment operations"—and because they are not "interstate drivers" under the Wage Order exemption. Although we disagree with the district court's interpretation of the Wage Order, we reach the same result and therefore affirm. In our view, Plaintiffs perform work in a covered industry but are exempt from the Wage Order's overtime provisions because they are "interstate drivers."

Our interpretation and application of the Wage Order is governed by Colorado law, and because the terms at issue are not defined, we "look[] to the plain meaning of the language used, considered within the context of the statute as a whole." *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1143 (10th Cir. 2011) (quoting *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010)). If a statute's plain meaning and context still leave it "capable of being understood by reasonably well-informed persons in two or more different senses," *Allen v. Geneva Steel Co*. (*In re Geneva Steel Co.*), 281 F.3d 1173, 1178 (10th Cir. 2002), then—and only then—do we "look beyond that language 'for other evidence of legislative intent and purpose, such as legislative

20

history or other rules of statutory construction.'" *Salazar*, 644 F.3d at 1143–44

(quoting *Crandall v. City & Cty. of Denver*, 238 P.3d 659, 662 (Colo. 2010)).[6] When

read in context, we do not believe the disputed terms here present any ambiguity.

We reach our conclusion by addressing two related interpretive questions:

first, whether truck drivers perform work in a covered industry under the Wage

Order, such as a "Commercial Support Service"; and second, if truck drivers *do*

perform work in a covered industry, whether Plaintiffs are considered exempt as

"interstate drivers" under the Wage Order exemption. 7 COLO. CODE REGS. § 1103-

1:2–1:5. The first question is easily addressed by applying the canon against

superfluity. An exemption from coverage for "interstate drivers" would be rendered

meaningless if at least one of the covered industries under the Wage Order were not

construed to include them in the first place. In other words, if interstate drivers did

not perform work in a covered industry then it would have been totally unnecessary

to include an "interstate drivers" exemption, thereby rendering it superfluous. And

---

[6] Plaintiffs argue that the Wage Order is remedial and rely on *In re R.C.* for the proposition that "[a] remedial statute is to be liberally construed to accomplish its object." 309 P.3d 954, 956 (Colo. App. 2013); *see also* COLO. REV. STAT. § 8-6-102 (requiring courts to "liberally construe[]" the Colorado Minimum Wages of Workers Act, "or any part thereof"). But this maxim "is useless in deciding concrete cases. Every statute is remedial in the sense that it alters the law or favors one group over another. . . . Knowing that a law is remedial does not tell a court how far to go. Every statute has a stopping point, beyond which, [the legislative branch] concluded, the costs of doing more are excessive—or beyond which the interest groups opposed to the law were able to block further progress. A court must determine not only the direction in which a law points but also how far to go in that direction." *Stomper v. Amalgamated Transit Union, Local 241*, 27 F.3d 316, 320 (7th Cir. 1994). Plaintiffs do not provide any interpretive direction, however, suggesting that the Colorado General Assembly intended to have the overtime provisions reach all truck drivers.

21

Colorado courts "avoid constructions that render any term superfluous or any result illogical." *M.T. v. People*, 269 P.3d 1219, 1222 (Colo. 2012); *Rajala v. Gardner*, 709 F.3d 1031, 1038 (10th Cir. 2013) ("[I]t is a cardinal principle of statutory construction that . . . if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))). At least one of the Wage Order's covered industries therefore must necessarily include interstate truck drivers.

The second question—whether Plaintiffs qualify as "interstate drivers" under the exemption to the Wage Order—is also easily addressed by reference to our FLSA analysis above. Like the other terms in the Wage Order, "interstate drivers" is not defined. Because it is an exemption, the court should construe it narrowly. *CIR v. Clark*, 489 U.S. 726, 739 (1989) (where "a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision"). The parties here both agree that the "interstate drivers" exemption under the Wage Order should be read in harmony with the meaning of interstate commerce under the MCA exemption to the FLSA. We read these two exemptions harmoniously because many of the Wage Order provisions (including the overtime exemptions) are patterned largely after the FLSA. *Compare* 7 COLO. CODE REGS. § 1103-1:5 (exempting administrative, executive, professional, and sales employees from the overtime requirements), *with* 29 U.S.C. § 213(a)(1) (same). And where a state law is patterned after a federal law or designed to implement its policies, federal constructions of the law "should be accorded great weight." *See*

22

*People v. Gallegos*, 251 P.3d 1056, 1062 (Colo. 2011). Because Plaintiffs are engaged in interstate commerce for purposes of the MCA exemption to the FLSA (as we established above), they are also "interstate drivers" under the Wage Order exemption.

In interpreting the Wage Order, the district court concluded Plaintiffs were not "equipment operat[ors]" in the "Commercial Support Service" industry because it found it "unlikely that the legislature desired to include motor carrier drivers transporting interstate goods . . . under the vague category of equipment operators." The court based this reading entirely on the fact that the Wage Order exempts interstate drivers. But as explained above, the "interstate drivers" exemption would be rendered superfluous if Plaintiffs were not considered to perform work in a covered industry—whether as equipment operators in the "Commercial Support Service" industry or otherwise.[7] This interpretive matter aside, we agree with the district court that Plaintiffs are "interstate drivers" and thus exempt from the Wage Order, including its overtime provisions. We therefore affirm the district court's grant of summary judgment in Decker's favor on Plaintiffs' Wage Order claim.

## IV.    CONCLUSION

By backhauling hops, pallets, empty kegs and other materials from the Rez to the brewery, Plaintiffs were engaged in an intrastate leg of an interstate journey. As a

---

[7] The parties here specifically dispute whether Plaintiffs performed work in the "Commercial Support Service" industry as "equipment operat[ors]." 7 COLO. CODE REGS. § 1103-1:2(B). We need not reach this question, however, because we conclude Plaintiffs are exempt from the statute altogether as "interstate drivers."

result, they were moving goods in interstate commerce, subject to the power of the

Secretary of Transportation, and thus exempt from the FLSA's overtime provisions.

Plaintiffs' deliveries in interstate commerce similarly exempted them from

Colorado's Wage Order. Accordingly, the district court properly granted summary

judgment in Decker's favor on both of Plaintiffs' claims, and we AFFIRM.[8]

---

[8] Decker has filed a motion to seal certain pages of the record on the ground that they contain proprietary business information unnecessary to the determination of the parties' substantive rights. While the public generally has a right to access documents in the court's record, a party may overcome the presumption in favor of public access to judicial records by demonstrating the pages contain "sources of business information that might harm a litigant's competitive standing." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). And the public's interest in access to judicial records is lessened when the contents are not "used to determine [the] litigants' substantive legal rights." *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1242 (10th Cir. 2012). We agree with Decker that the identified pages contain proprietary business information which is unnecessary to our disposition of this appeal. We therefore grant the motion with respect to the identified pages.