FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

HUA JIANG,

     Plaintiff - Appellant,

v.

CITY OF TULSA,

     Defendant - Appellee.

No. 25-5097

———————————————————

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:23-CV-00255-CVE-CDL)**
———————————————————

Mark A. Smith of Caruso & Smith, PLLC, Tulsa, Oklahoma (Daniel E. Smolen of Smolen & Roytman, PLLC, Tulsa, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

Hayes T. Martin, Assistant City Attorney (Jack C. Blair, City Attorney, and R. Lawson Vaughn, Senior Assistant City Attorney with him on the brief), Tulsa, Oklahoma, for Defendant-Appellee.
———————————————————

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.
———————————————————

**PHILLIPS**, Circuit Judge.
———————————————————

When he applied to be the superintendent of Tulsa's A.B. Jewell water-treatment plant, Hua Jiang was an accomplished engineer. But the city wanted

someone with leadership experience. And Jiang, a middle-aged man from China, didn't have any. So the city hired a younger, white candidate who did.

In the process, the city violated its written hiring policies. Those policies required the city to hire someone with a college degree in biology, engineering, environmental sciences, or a related field. Yet the hired candidate didn't have a degree at all. Jiang reported the city's error to its civil-service commission, which confirmed that the city had violated its policies.

In response, the city removed the job posting's degree requirement to reflect the city's customary practice of substituting experience for education. The city then redid its hiring. The same three people applied, and, again, the city hired the candidate with more leadership experience.

Jiang sued the city for discrimination. He alleged that the reason the city didn't choose him for superintendent was his age and race. Though the city had said that it wanted a candidate with more leadership experience, Jiang argued that this justification was pretext for the city's discriminatory animus. He also argued that the city removed the degree requirement to retaliate for his reporting discrimination.

At summary judgment, Jiang pointed to his superior qualifications, the city's subjective hiring process, and the procedural shortcuts the city took to hire its preferred candidate. But Jiang didn't point to facts upon which a jury could find that the city was untruthful about valuing a candidate with

2

leadership experience. So the district court granted summary judgment to the city.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.     Factual Background

We present the facts in the light most favorable to Jiang, the nonmoving party. *See Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1151 n.1 (10th Cir. 2016).

When he sued, Jiang was a senior engineer at Tulsa's A.B. Jewell water-treatment plant. Jiang was born in China and speaks English with a Chinese accent. He holds a Ph.D. in engineering, and though he excelled in his job, outside contractors sometimes complained that he was hard to work with.

By 2021, Jiang had worked for Tulsa's water department for over a decade. During that time, he applied to many managerial positions. He did so because he wanted managerial experience: outside of coaching a water-department quiz-bowl team, Jiang hadn't supervised anyone except a temporary employee and a few interns. And he thought moving to a managerial role could position him to one day run the department. Yet every time he applied for a managerial role, the city picked a white candidate instead.

In June 2021, when Jiang applied to be A.B. Jewell's superintendent, it happened again. The city picked one of the two younger, white men who had also applied. Dylan Hutchcraft, the eventual pick, was an operations supervisor

at one of Tulsa's other water-treatment plants. In that role, he oversaw multiple employees. And years before, while deployed in Afghanistan with the National Guard, he had served as a squad leader. John Curry, the other applicant, was an A.B. Jewell maintenance supervisor who led a team of ten.

The hiring process began uneventfully. The city followed its familiar two-step procedure. First, the city's personnel director certified Jiang, Hutchcraft, and Curry as being qualified for the position. The personnel director gave that list of candidates to Stefanie Hunter, the hiring manager for the position.

Second, Hunter decided whom to hire from the certified applicants. Though she had ultimate hiring authority, she convened a panel to interview and evaluate the candidates. That panel consisted of Hunter and two other senior water-department employees. The panel interviewed Jiang, Hutchcraft, and Curry, asking the same questions of each and grading under a uniform matrix. One panelist ranked Hutchcraft first, Jiang second, and Curry third. The other two ranked Hutchcraft first, Curry second, and Jiang third. After concluding that Hutchcraft had the best mix of technical knowledge and leadership experience, Hunter hired him.

Then the process took a turn. When Jiang found out that Hutchcraft was hired over him, he complained of race and age discrimination to the city's human-resources department. According to Jiang, the personnel director shouldn't have certified Hutchcraft and Curry as applicants, as neither met the

4

job's education requirement. The human-resources department denied Jiang's grievance, and Jiang appealed to the city's civil-service commission.

For good reason, the civil-service commission agreed with Jiang. To start, the city had recently revised the minimum requirements for the treatment-plant-superintendent position. Those revisions preserved an education requirement: "a bachelor's degree in engineering technology, environmental/biological sciences, or a related field." App. vol. II at 566. And even though the position also permitted "an equivalent combination of training and experience," *id.*, that option didn't apply. Why? Because, for positions requiring a specific degree, the city's written policy prohibited substituting experience for education. Neither Hutchcraft nor Curry had a college degree, let alone one in engineering or biology. Thus, according to the city's written policy, the personnel director never should have certified them. The civil-service commission told the city to "go back and follow" its policies. App. vol. III at 803.

So the city rewrote the position's education requirement. Put bluntly, the city changed the job description to qualify Hutchcraft and Curry. First, the city removed the degree requirement. The new description instead required 120 hours of college credit in any discipline. Second, the city gave a new formula for substituting experience for education. That formula treated applicants who had sixty hours of college credit and seven years of relevant experience as if they had 120 hours of college credit. Conveniently, Curry had exactly sixty

5

hours of college credit and seven years of relevant experience. Hutchcraft had sixty-six and eight. So under the new requirements, both Hutchcraft and Curry qualified for the job.

Years later, in depositions, two senior water-department managers worried about these changes. One said that removing the degree requirement was improper. And she agreed with Jiang's counsel that something seemed odd: the city had made the qualifications for superintendent lower than those for the superintendent's immediate subordinate. The other manager said that it was inappropriate to change a job's requirements to suit a desired candidate.

But from the personnel director's perspective, the city had followed its custom all along, if not its written rules. In a declaration, the director explained that the city's "past practice regarding the substitution of experience for education did not reflect its written policies." App. vol. II at 322. That past practice let the director substitute experience for education if an applicant met at least half the position's education requirement. So in the director's view, the new job description reflected the city's "consistent past practice." *Id.*

Plus, emails from the time Jiang first applied to the position show that human-resources employees believed that this was the policy. That's why the personnel director had qualified Hutchcraft and Curry in the first place. Indeed, the city had hired at least one other treatment-plant superintendent who hadn't met the subject-specific degree requirement. And the city had other supervisors whose subordinates had higher professional or educational qualifications.

6

After removing the degree requirement, the city reposted the position. Again, Jiang, Hutchcraft, and Curry applied.

Hunter convened a new panel to interview and evaluate the candidates. This second set of reviewers used an updated evaluation matrix. The new matrix addressed "the essential tasks in the job description" and omitted certain "fuzzier" inquiries, like enthusiasm for the role. App. vol. II at 482. Under that matrix, one reviewer ranked Jiang first, Hunter ranked him second, and a third ranked him last.[1] Meanwhile, Hutchcraft was ranked first by Hunter and second by both of the other reviewers. After considering the reviewers' evaluations and the candidates' materials, Hunter again picked Hutchcraft.

After learning that Hunter had again hired Hutchcraft instead of him, Jiang filed another grievance with the human-resources department. That department denied his grievance, and Jiang again appealed to the civil-service commission. But this time, the commission denied Jiang's grievance, concluding that the city "did follow its policies in this matter." App. vol. IV at 1050.

## II.    Procedural History

Jiang sued the city for race discrimination under Title VII of the Civil Rights Act of 1964, for age discrimination under the Age Discrimination in

---

[1] The reviewer who ranked Jiang last said she evaluated him on his interview performance and lack of supervisory experience, not on his application or resume.

Employment Act, and for race and age discrimination under the Oklahoma Anti-Discrimination Act. *Jiang v. City of Tulsa*, No. 23-CV-255, 2025 WL 1557283, at *4 (N.D. Okla. June 2, 2025). He brought retaliation claims under these statutes as well. *Id.* He also brought an Equal Pay Act claim, which the district court dismissed. *Id.* After discovery, the court granted the city's motion for summary judgment on all remaining claims. *Id.* at *1, *10. Jiang appealed the summary-judgment decision.[2]

## DISCUSSION

We review de novo the district court's grant of summary judgment. *EEOC v. Picture People, Inc.*, 684 F.3d 981, 985 (10th Cir. 2012). We affirm if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if it could let a rational jury find for the nonmoving party. *Id.* We view the evidence in the light most favorable to the nonmoving party, resolving all disputed facts and making all reasonable inferences in his favor. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 882 (10th Cir. 2015).

The district court accepted that Jiang had made a prima facie case of age and race discrimination. *Jiang*, 2025 WL 1557283, at *6. But it held that he hadn't shown that the city's legitimate explanations for hiring someone else

---

[2] On appeal, Jiang doesn't separately analyze his OADA claims, so we don't separately consider them in this opinion.

8

were pretextual. *Id.* at *7–8. It also held that Jiang didn't make a prima facie retaliation case. *Id.* at *9–10.

On appeal, Jiang argues that the record contained evidence of pretext, so a jury should hear his disparate-treatment and retaliation claims. We disagree.

## I.    Disparate Treatment

Because Jiang has no direct evidence of age or race discrimination, we apply the *McDonnell Douglas* burden-shifting framework to his ADEA and Title VII claims. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020); *Johnson v. Weld County*, 594 F.3d 1202, 1210 (10th Cir. 2010).[3]

That framework has three steps: (1) the employee makes a prima facie case of discrimination, or else the employer wins; (2) the employer offers a "legitimate, nondiscriminatory reason for the adverse employment action," or else the employee wins; and (3) the employee identifies facts that could let a jury find each of the employer's legitimate reasons pretextual, or else the employer wins. *See Jenny v. L3Harris Techs., Inc.*, 144 F.4th 1194, 1198 (10th Cir. 2025). Jiang need not show other evidence of discrimination: pretext itself

---

[3] Jiang asks us to stop using the *McDonnell Douglas* framework at summary judgment in Title VII and ADEA cases. But earlier panel decisions bind us unless there's "en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Reed*, 39 F.4th 1285, 1295 (10th Cir. 2022).

lets a juror infer it. *See Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025).

At the first step of *McDonnell Douglas*, the city conceded that Jiang made a prima facie case of discrimination. *See Jiang*, 2025 WL 1557283, at *6. So we need not dwell on this step. *See, e.g., Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013).

At the second step, the city gave nondiscriminatory reasons for not hiring Jiang. *See Jiang*, 2025 WL 1557283, at *6. The decisionmaker, Hunter, wanted a candidate with both technical knowledge and leadership experience. Hutchcraft had both. And though Jiang had more technical knowledge, he didn't have leadership experience.[4]

At the third step, the district court held that Jiang didn't show facts that would let a reasonable jury find pretext. *Id.* at *7–8.

Pretext is where our analysis begins and ends. At summary judgment, an employer's justification is pretextual if it is "so incoherent, weak, inconsistent, or contradictory" that a reasonable jury could find it "unworthy of belief." *Bekkem v. Wilkie*, 915 F.3d 1258, 1268 (10th Cir. 2019) (citation omitted). When deciding whether an explanation is pretextual, we consider the facts from

---

[4] In its motion for summary judgment, the city also asserted that "Jiang had proven to be difficult to work with and unwilling to compromise with outside contractors." App. vol. I at 58. In fact, outside contractors had complained to Hunter and another reviewer about difficulties working with Jiang.

10

the decisionmaker's point of view. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). We then ask whether the decisionmaker "honestly believed" her nondiscriminatory reasons for hiring someone else. *Johnson*, 594 F.3d at 1211 (citation omitted). And that's *all* we ask—not whether the hiring decision was "wise, fair or correct." *Id.* (citation omitted).

On appeal, Jiang disputes the city's explanation that it wanted a candidate with more leadership experience. He offers three theories of pretext. First, there were two procedural irregularities. Second, Hunter used subjective selection criteria. And third, Jiang's qualifications eclipsed Hutchcraft's.

We reject Jiang's arguments because none render the city's explanation "unworthy of belief." *Bekkem*, 915 F.3d at 1268 (citation omitted).

## A.    Procedural Irregularities

A prospective employee can show pretext by pointing to a procedural irregularity. *See Conroy*, 707 F.3d at 1176. But not all procedural irregularities show pretext. *Johnson*, 594 F.3d at 1213. The irregularities must "directly and uniquely disadvantage[] a minority employee" or applicant. *Id.* And ultimately, the factfinder must be able to infer that "the employer didn't really believe" the reasons it gave for hiring someone else. *Id.* at 1211; *Randle v. City of Aurora*, 69 F.3d 441, 454–55 (10th Cir. 1995).

Jiang argues that two procedural irregularities reveal pretext. First, the human-resources department certified Hutchcraft and Curry before the first set of interviews, even though neither qualified for the job under the city's written

policies. Second, after being told that Hutchcraft and Curry didn't qualify, the city rewrote the job's requirements to qualify them.

On the first procedural-irregularity argument, our unpublished opinion in *Hamilton v. Oklahoma City University* persuades us that Jiang hasn't identified a procedural irregularity that reveals pretext. 563 F. App'x 597 (10th Cir. 2014). In *Hamilton*, a university hired a male All-But-Dissertation applicant—meaning he'd met all the requirements for a Ph.D. except the dissertation—over a female applicant with a Ph.D., even though the job posting required a Ph.D. *Id.* at 598–99. The university gave several legitimate reasons for choosing the male, ABD candidate. *See id.* at 599–600. Most relevant here, the university officials said—and the female candidate didn't contradict—that they hired ABD candidates for positions requiring a Ph.D. "all the time." *Id.* at 604 (citation omitted). We concluded that the alleged procedural irregularity didn't establish that the officials' explanation was pretextual. *See id.* at 606.

Similarly here, the city hired a younger, white applicant without a degree over an older, Asian applicant with a degree, even though the job posting required a degree. But as in *Hamilton*, Jiang didn't contradict the city's evidence that it regularly substituted experience for education, even for jobs requiring a specific degree. Nor did he contradict evidence showing that the personnel director had previously certified a treatment-plant superintendent who hadn't met the degree requirement.

Pressed at oral argument, Jiang's counsel argued that the civil-service commission's decision—that the city had not followed its written policy—itself shows pretext. But the commission's decision never contradicts the city's explanation: for years, the city had followed a custom inconsistent with its written policy.

As for the second procedural irregularity, Jiang points to the city's relaxing the requirements and reposting the position. Generally, relaxing requirements and reposting a position won't by itself let a jury find pretext. For example, in *Conroy*, after the plaintiff applied to a position in the Forest Service, the agency relaxed the qualifications and reposted the job. *See* 707 F.3d at 1166. At *McDonnell Douglas* step two, the agency explained that it relaxed and reposted the position because the applicant pool was too small: only two people had applied. *Id.* at 1179. Plus, agency policy permitted the agency to do just that, and the agency had even done so for other positions. *See id.* at 1180. At *McDonnell Douglas* step three, the plaintiff then had to identify evidence that would contradict the agency's nondiscriminatory explanation. *See id.* She didn't, so we held that no reasonable jury could find pretext. *Id.*

Still, combined with other factors, serious procedural irregularities can let a jury find pretext. For example, in *Mohammed v. Callaway*, the plaintiff applied to be a munitions chief at an Army base. 698 F.2d 395, 397 (10th Cir. 1983). At *McDonnell Douglas* step one, he showed that the position required an engineering degree and that the Army hired a white applicant who lacked an

engineering degree and had less experience than the plaintiff, who was of Mexican-Pakistani origin. *See id.* at 396–97. At step two, the Army said that the white applicant was just as qualified as the plaintiff. *See id.* at 399.

At step three, the plaintiff proved that the Army's justification was pretextual, in part because of procedural irregularities. *Id*. at 401. The job posting had stated that applicants would be "ranked by an ad hoc committee as to best qualified." *Id*. at 397 (citation omitted). But the Army neither convened an ad hoc committee nor ranked the applicants before picking the white one. *Id*. at 398. Instead, after the plaintiff complained, the Army convened a committee to retroactively rank the candidates using a rubric created to correspond to the white applicant's strengths. *See id.* at 398, 400–01 & n.4. These irregularities, coupled with the plaintiff's uniformly superior qualifications, convinced us to reverse a bench verdict for the Army. *Id.* at 401.

Jiang's situation resembles *Conroy* and *Hamilton* more than it resembles *Mohammed*. As in *Conroy*, the city relaxed and reposted its job description to capture applicants with the background it wanted: technical knowledge and leadership experience. And unlike the Army in *Mohammed*, the city revised the position and restarted its entire hiring process instead of retroactively justifying a facially unqualified candidate.

From Jiang's perspective, though, two facts save his relaxing-and-reposting argument.

14

First, according to Jiang, two senior water-department employees testified that relaxing the job's requirements didn't make sense. One called removing the degree requirement "improper," App. vol. V at 1197, and the other confirmed that changing a job's requirements to suit a desired candidate was not appropriate.

Removing the degree requirement may have been improper and inappropriate. But our role is to protect against unlawful discrimination, not to verify that employment decisions are "wise, fair or correct." *Johnson*, 594 F.3d at 1211 (citation omitted). Relaxing the education requirement doesn't undermine the city's explanation that it wanted a candidate with both technical knowledge and leadership experience. Hutchcraft had technical knowledge, even though he didn't have a degree. And though Hunter and the personnel department may have cut corners to hire Hutchcraft, their corner cutting coheres with the city's nondiscriminatory explanation: it wanted a candidate with both technical knowledge and leadership experience.

Second, Jiang points to a quirk in the city's explanation. After the city relaxed and reposted the position, the superintendent's subordinate needed a college degree, but the superintendent didn't. Again, we need not decide whether this was wise or correct. *See Johnson*, 594 F.3d at 1211. Instead, we need only decide whether this renders the city's preferring a superintendent with leadership experience "incoherent, weak, inconsistent, or contradictory." *See Bekkem*, 915 F.3d at 1268 (citation omitted). And it doesn't. Plus,

15

unrebutted testimony said that other managers supervised employees with higher technical qualifications.

Without more, the procedural irregularities here aren't enough to show pretext.

## B.    Subjectivity

Next, Jiang argues that the city's interview process was so subjective that it reveals pretext. To Jiang, Hunter's rubrics and panel interviews only distracted from her ultimate authority to choose a candidate based on discriminatory criteria—like Jiang's race or age. As proof, he points to Hunter's choosing Hutchcraft over Jiang despite Jiang's evaluations from the second set of reviewers. In response, the city points to its rubrics and panel interviews.

An employer's system for evaluating employees can be so subjective that it reveals pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002). But we send that question to a jury only when hiring rationales are so opaque that they might hide "unspoken discriminatory input." *Conroy*, 707 F.3d at 1178 (citation omitted). And for a rationale to be *that* opaque, the "criteria on which the employers ultimately rely" must be "*entirely* subjective." *Id.* (citation omitted). Even subjective evaluations—opinions on qualities like leadership or professionalism—don't support pretext when evaluators explain their impressions and grade all candidates using the same

criteria. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1200 (10th Cir. 2008).

Here, the evaluators did just that. Hunter and the other reviewers used the same criteria: experience managing conflicts between personnel, experience issuing disciplinary actions, and experience directing the work of treatment-plant employees, among other criteria. And through their notes—and retrospectively in depositions—the evaluators showed their work. So even though Hunter had ultimate authority to choose a candidate, Jiang gives no reason to disbelieve Hunter's testimony that she considered the applicants' materials and the panel reviewers' observations.

Finally, Jiang notes that after the second interview, one reviewer ranked him as the most qualified candidate, and another ranked him as the least. But there's no pretext in different reviewers attaching different weight to different criteria. *Conroy*, 707 F.3d at 1178. In fact, that's why employers often "employ more than one individual to evaluate subjective criteria," as the city did here. *See id.* (citation omitted). So we reject Jiang's subjectivity argument.

### C.    Overqualification

Jiang next argues that not being hired despite his superior qualifications could let a jury find pretext. Indeed, the city concedes that Jiang had better technical knowledge than Hutchcraft. But according to the city, Hutchcraft's technical knowledge sufficed for the role. More importantly, Hutchcraft had

leadership experience while Jiang did not, and Hunter wanted someone with both.

A jury can find pretext based on overqualification only when there's an "overwhelming disparity in qualifications." *Johnson*, 594 F.3d at 1211 (citation modified). And we don't permit cherry-picking some qualities over others. For instance, in *Conroy*, the female plaintiff had better technical qualifications than the eventual male hire. *See* 707 F.3d at 1174. Even so, the Forest Service had said that technical qualifications were not all it wanted in a candidate. *See id.* at 1172–73. Most of all, it wanted leadership and program-management experience. *Id.* And the eventual male hire had both. *Id.* at 1173. Thus, in those "very key area[s]," the plaintiff didn't show "overwhelming merit disparity." *Id.* (citation omitted). So a jury couldn't find pretext through overqualification. *See id.* at 1174.

*Conroy* sinks Jiang's argument. Like the plaintiff in that case, Jiang had better technical qualifications than Hutchcraft, the eventual hire. *See id.* And like the Forest Service, the city wanted both technical qualifications and leadership. *Id.* at 1172–73. Jiang concedes that Hutchcraft had leadership experience. Hutchcraft oversaw subordinates in his city job and had served as a squad leader while deployed in Afghanistan. In contrast, Jiang had at most supervised a few interns, a temporary employee, and a quiz-bowl team. By his own account, he applied for management jobs in part to acquire leadership

18

experience. In short, Hutchcraft outmatched Jiang in a "very key area," *see id.* at 1173, so we reject Jiang's overqualification argument.

*    *    *

Finally, Jiang argues that his disparate-treatment arguments cumulatively allow a jury to find pretext. We disagree. Even taken together, the evidence supporting Jiang's three theories wouldn't let a jury find the city's explanation for choosing Hutchcraft pretextual. *See, e.g., Kincaid v. Unified Sch. Dist. No. 500*, 94 F.4th 936, 950 (10th Cir. 2024). We affirm summary judgment on Jiang's disparate-treatment claims.

## II.    Retaliation

On appeal, Jiang argues two theories of retaliation. First, he says that the city retaliated by tailoring the revised education requirement "to the two white and younger applicants." Op. Br. at 25. Second, he says the city chose not to hire him the second time to retaliate for his complaint to the civil-service commission.

To start, we ordinarily decline to consider arguments made for the first time on appeal. *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1142 (10th Cir. 2023). Jiang made his latter argument for the first time on appeal, so we address only the former.

To show retaliation under Title VII and the ADEA, an employee must show (1) that he engaged in protected opposition to discrimination, (2) that "a reasonable employee would have found the challenged action materially

19

adverse," and (3) that there was a causal connection between the two. *See Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (citation omitted); *Hinds*, 523 F.3d at 1201–02. Because Jiang lacks direct evidence of retaliation, we again apply *McDonnell Douglas* burden-shifting. *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009); *Hinds*, 523 F.3d at 1201.

For his prima facie retaliation case, Jiang argues that (1) his civil-service-commission complaint was protected opposition, (2) the city's changing the job description was a materially adverse action, and (3) the short time between his complaint and the city's rewrite showed causation. And, citing his disparate-treatment theories, he argues that the city's explanation is pretextual. The city argues that Jiang neither made a prima facie case nor showed pretext.

Even if we assume that Jiang made a prima facie case, he didn't show pretext. According to the city's personnel director, the city changed the education requirement to "reflect the previous practice of the City of Tulsa." App. vol. II at 323. And as we explained, Jiang never contradicted this legitimate explanation. So we affirm summary judgment on his retaliation claim.

## CONCLUSION

We affirm the district court's judgment.