**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

RAMIRO ALCALA, as personal
representative of the estate of Diego
Eguino-Alcala, deceased,

     Plaintiff - Appellant,

v.

DEPUTY SHERIFF ARTURO
ORTEGA; BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF DONA ANA;
KIMBERLY STEWART,

     Defendants - Appellees.

No. 24-2027

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:22-CV-00755-WJ-JHR)**
_____

Laura Schauer Ives (Adam C. Flores, Henry A. Jones, and Alyssa Quijano, with
her on the briefs), of Ives & Flores, PA, Albuquerque, New Mexico, for
Plaintiff-Appellant.

Haley R. Grant (Blaine T. Mynatt, with her on the brief), of Mynatt Springer
P.C., Las Cruces, New Mexico, for Defendants-Appellees.

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

This appeal arises from the fatal shooting of Diego Eguino-Alcala during a standoff with a deputy sheriff from Doña Ana County, New Mexico. The Personal Representative of Eguino-Alcala's estate (the "Estate") appeals the district court's orders granting summary judgment on all federal claims. The district court awarded qualified immunity to Deputy Sheriff Arturo Ortega, which necessitated the dismissal of the Estate's associated claims against Deputy Ortega and the Board of County Commissioners of Doña Ana County under 42 U.S.C. § 1983. The Estate appealed. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background[1]

On October 4, 2020, Eguino-Alcala drove a car that was involved in an accident in Las Cruces, New Mexico. At about 10:04 a.m., a bystander called 911 to report the crash. Around the same time, several other bystanders tried to assist Eguino-Alcala, who was knocked unconscious by the automobile crash. About then, another caller advised that a "male" had retrieved a rifle from the

---

[1] "In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party, as is appropriate when reviewing a grant of summary judgment." *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1151 n.1 (10th Cir. 2016) (internal quotation marks omitted).

back of his trunk and pointed it at the crowd.[2] But by 10:10 a.m., a caller reported losing sight of the driver (later determined to be Eguino-Alcala), who had regained consciousness and fled on foot. A minute later, dispatch radioed that "the subj[ect] with [a firearm] went n[orth] on main [wearing] white pants [and a] black shirt[.]" App. vol. I, at 99. And at 10:12 a.m., dispatch radioed that another caller had said that the shotgun was in a silver vehicle. Dispatch then radioed yet another caller's report that a male had a firearm. Moments later, a 911 caller stated that a "male [in a] white shirt [with] blue jeans [had] brandish[ed] a gun." *Id.*

Deputy Ortega heard the report of a car crash when he was home for lunch. He immediately drove to the accident location, where "an older gentleman" standing on South Main Street hurriedly approached the deputy's patrol car while pointing and shouting about the incident. OIS Interview at 0:02:43–0:02:55.[3] He told Deputy Ortega the following information:

- A man has a gun;

- The man had pointed the gun at people;

- The man ran "that way" (gesturing toward the opposite direction of South Main Street); and

---

[2] The police communicated by referring to the firearm as a "10-80." Where we bracket the word firearm, we are substituting that familiar word for the police code.

[3] We cite any video or audio recording by file name. Any citation to "OIS Interview" refers to Deputy Ortega's Officer-Involved-Shooting (OIS) Interview (BN 001538).

- The man wore a white shirt.

*Id.* at 0:02:55–0:03:37; BN 2787 at 0:05:23–0:05:30.[4] Other bystanders yelled, "He's running that way, he has a gun." OIS Interview at 0:03:25–0:03:31.

Deputy Ortega turned his car around and drove to Bell Avenue.[5] He turned onto Oak Street, where he turned again and drove to a ditch bank on East Union Street. There, Deputy Ortega spotted a man matching the description (later determined to be Eguino-Alcala) running west toward Oak Street. In pursuit, Deputy Ortega drove back to Oak Street. He parked his vehicle at the dead-end of Oak Street and got out to look for the running man. While standing on Oak Street, Deputy Ortega saw Eguino-Alcala "run across Oak and onto Manso [Avenue]." App. vol. I, at 103. He returned to his patrol car to pursue Eguino-Alcala.

Deputy Ortega drove a block down Oak Street and turned right onto Manso Avenue. After completing the turn, his forward-fastened dashcam video shows Eguino-Alcala in the shadow of a parked ambulance and running away

---

[4] The dashcam footage corroborates Deputy Ortega's testimony from the OIS Interview. *See* BN 2787 at 0:05:12–0:05:30. Toward the start of his interaction with the approaching man, though not clearly discernible on the tape, a male voice says, "He has a gun." *Id.* at 0:05:22–0:05:23. After more garbled audio, we hear Deputy Ortega asking, "What's he wearing?" to which the man responds, "White shirt." *Id.* at 0:05:23–0:05:29.

[5] The parties use incorrect street names in their briefs and in the record. We take judicial notice of a Google map depicting the locations of relevant events "as a source whose accuracy cannot reasonably be questioned." *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (cleaned up). We use the street names depicted on that map.

from it. BN 2787 at 0:09:17. As Deputy Ortega neared the ambulance, its driver stepped out of it and excitedly gestured toward the fleeing Eguino-Alcala.

Deputy Ortega pulled alongside Eguino-Alcala, stepped out of the patrol car, aimed his firearm at Eguino-Alcala, and commanded him to halt. *Id.* at 0:09:20–0:09:28; App. vol. I, at 103. Eguino-Alcala stopped but turned his body sideways to the deputy and hunched over with his left hand on his knee and his right arm and hand blocked by his body from the deputy's view. BN 2787 at 0:09:24–0:09:32; BN 5396 at 0:00:06. Deputy Ortega repeatedly commanded Eguino-Alcala to "get on the ground" and "put your hands up." BN 2787 at 0:09:26–0:09:32; App. vol. I, at 104. Eguino-Alcala failed to comply. App. vol. I, at 104, 236–37; Ortega Dep. at 0:28:37–0:29:12; BN 2787 at 0:09:30–0:09:33. After about six seconds, Eguino-Alcala quickly twisted to his left and swung his right hand up with his index finger pointing, as if drawing a gun. App. vol. I, at 104; BN 5399 at 0:00:11; BN 5396 at 0:00:23.

Deputy Ortega fired nine shots, and his dashcam video shows all nine cartridges ejecting.[6] This enables us to see exactly what Eguino-Alcala was doing at the deputy's first shot. We note that the video shows Eguino-Alcala beginning to twist his body upward toward Deputy Ortega before the deputy fired his first shot. BN 2787 at 0:09:34; BN 5399 at 0:00:14. From that shot, the ejected cartridge soon crosses the video screen. BN 2787 at 0:09:35; BN

---

[6] We agree with the parties that Deputy Ortega fired nine shots. App. vol. I, at 19, 258; App. vol. II, at 305, 318.

5399 at 0:00:15. Of Deputy Ortega's nine shots, three struck Eguino-Alcala.

BN 5399 at 0:00:12–0:00:36; BN 2787 at 0:09:34–0:09:38. He died from his

wounds. With Eguino-Alcala no longer posing a threat, law enforcement

officers were able to safely determine that Eguino-Alcala had no firearm.

## II.    Procedural History

After the fatal shooting, the Estate sued Deputy Ortega and the Board in

New Mexico state court, asserting only state-law claims. The Estate later

amended its complaint to include claims for excessive force and municipal

liability under 42 U.S.C. § 1983 and added Sheriff Stewart as a defendant in her

official capacity. Because of the new federal claims, Defendants removed the

case to federal district court. In its operative fifth amended complaint, the

Estate alleges five claims: (1) Battery, against Deputy Ortega and the Board,

(2) Negligence Resulting in a Battery, against the Board, (3) Failure to Comply

with Statutory Duties, against all Defendants, (4) Fourth Amendment Violation:

Excessive Force, against Deputy Ortega, and (5) Municipal Liability, against

the Board.

Deputy Ortega moved for summary judgment on the Estate's excessive-

force claim based on qualified immunity.[7] *Alcala v. Ortega*, No. 2:22-CV-

---

[7] Defendants also moved for summary judgment on the state-law claims
for battery and negligence. At the motion's filing, an earlier iteration of the
complaint had named Sheriff Stewart in the negligence and municipal-liability
claims. While the motion was pending, the Estate filed the operative fifth
amended complaint, which removed Sheriff Stewart from those claims. The

(*footnote continued*)

6

00755-WJ-GBW, 2023 WL 7222867, at *1 (D.N.M. Nov. 2, 2023). The district court granted summary judgment against the excessive-force claim. *Id.* at *1, *10. First, the court concluded that Deputy Ortega did not use excessive force. *Id.* at *7–9. In doing so, the court examined the three factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989). The court ruled that Deputy Ortega's actions were reasonable under the totality of the circumstances. *Id.* It emphasized that Eguino-Alcala's sudden movement had caused Deputy Ortega to "reasonably perceive[] an immediate and lethal threat." *Id.* at *7. Second, the court concluded that Deputy Ortega's use of deadly force did not violate clearly established law. *Id.* at *9. For these reasons, the district court awarded Deputy Ortega qualified immunity and granted summary judgment on the excessive-force claim. *Id.* at *9–10.

Then the Board moved to dismiss the municipal-liability claim. The Estate conceded that this claim must fail given the district court's summary-judgment order in favor of Deputy Ortega, but it still opposed dismissal by contesting the order's reasoning. The district court dismissed the municipal-liability claim, remanded the state-law claims to state court, and entered final judgment. The Estate timely appealed the § 1983 dismissals and the final judgment.

---

only claim against Sheriff Stewart in the fifth amended complaint is the state-law claim for failure to comply with statutory duties.

7

**DISCUSSION**

## I.    Legal Standard

This appeal turns on whether the district court erred by granting Deputy Ortega qualified immunity against the Fourth Amendment excessive-force claim. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). This defense protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks omitted).

We review de novo a district court's grant of summary judgment under qualified immunity. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). We affirm a granted motion only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and is "genuine[ly]" disputed if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We must view the evidence in the light most favorable to the nonmoving party, as well as resolve disputed facts and

draw "all justifiable inferences" in favor of the nonmoving party. *Id.* at 255; *see Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

We have instructed courts to be "cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) (cleaned up). Courts "may not simply accept what may be a self-serving account by the police officer." *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). They "must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* (quoting *Henrich*, 39 F.3d at 915).

But "mere speculation, conjecture, or surmise" cannot defeat a summary-judgment motion, because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion." *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004). If the nonmoving party provides insufficient evidence to support its factual assertions, we may accept as true the moving party's version of the facts, as supported by the evidence. *See Helvie v. Jenkins*, 66 F.4th 1227, 1235–36 (10th Cir. 2023) (accepting as true the version

9

of the facts offered by the moving party's witness when the nonmoving party provides insufficient evidence to challenge the credibility of that witness). And "where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party," the court may grant summary judgment due to "the absence of evidence creating a triable issue of fact." *Helget v. City of Hays*, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017).

Qualified immunity "creates a presumption that the defendant is immune from suit." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (cleaned up). When a defendant asserts qualified immunity at the summary-judgment stage, the burden shifts to the plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The plaintiff must satisfy both prongs to overcome a qualified immunity defense." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 757–58 (10th Cir. 2021) (internal quotation marks omitted).

## II. Analysis

On appeal, the Estate attacks the district court's conclusions on both qualified-immunity prongs. The Estate argues that the district court erred by concluding (1) that Deputy Ortega did not use excessive force in violation of Eguino-Alcala's Fourth Amendment rights, and (2) that any such violation was not set by clearly established law. We have discretion to determine "which

10

prong to address first" and may cabin our analysis to a single prong if that sufficiently resolves the case. *Id.* at 758 (internal quotation marks omitted).

To start, the Estate argues that the district court erred at prong one of the qualified-immunity analysis. It contends that the district court overlooked genuine disputes of material fact and failed to view the evidence in the light most favorable to it as the nonmoving party. The Estate claims that a reasonable jury could conclude that Deputy Ortega violated Eguino-Alcala's Fourth Amendment rights. We disagree.

The Estate asserts a § 1983 claim based on an alleged violation of the Fourth Amendment for excessive force. To establish a valid excessive-force claim, a plaintiff must show (1) a seizure that was (2) unreasonable. *Graham*, 490 U.S. at 394 (stating that the Fourth Amendment "guarantees citizens the right to be secure in their persons against unreasonable seizures of the person" (cleaned up)). Here, Deputy Ortega shot and killed Eguino-Alcala, which qualifies as a seizure. So the excessive-force claim turns on whether the shooting was unreasonable. *See id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. We must analyze reasonableness based on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This "calculus of reasonableness" must account for

11

the "split-second judgments" that police officers must make "in circumstances that are tense, uncertain, and rapidly evolving[.]" *Id.* at 396–97. "[O]fficers need not wait until they see the gun's barrel or the knife's blade before using deadly force to protect themselves or those around them." *Est. of Taylor*, 16 F.4th at 747. And even an officer's mistaken belief can justify the use of deadly force—so long as that belief was reasonable. *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

In considering whether an officer's use of deadly force was reasonable, we review three factors (known as the *Graham* factors):

(1)   the severity of the crime at issue[;]

(2)   whether the suspect poses an immediate threat to the safety of the officers or others[;] and

(3)   whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396. "Deadly force is justified under the Fourth Amendment if a reasonable officer in [the defendant's] position would have had probable cause to believe that there was a *threat of serious physical harm to [the officer]* or to others." *Est. of Larsen*, 511 F.3d at 1260 (internal quotation marks omitted). At bottom, the ultimate question is "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* We now turn to the Estate's arguments, categorized by *Graham* factor, to determine if the district court erred on the question of reasonableness.

12

### A.    *Graham* Factor Two: Immediate Threat

We begin with the second *Graham* factor because it is "undoubtedly the 'most important' and fact intensive factor[.]" *Pauly*, 874 F.3d at 1216 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). This is especially so here. For this factor, the Estate argues that Eguino-Alcala posed no immediate safety threat to the officers or the public. We disagree. An officer may reasonably use deadly force if he "has cause to believe there is a serious threat to himself or others." *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022). We analyze the seriousness of a threat under the following non-exclusive factors (known as the *Larsen* factors):

> (1)    whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands;
>
> (2)    whether any hostile motions were made with the weapon towards the officers;
>
> (3)    the distance separating the officers and the suspect; and
>
> (4)    the manifest intentions of the suspect.

*Est. of Larsen*, 511 F.3d at 1260. Applying these factors, we conclude that Deputy Ortega reasonably believed that Eguino-Alcala posed an immediate and deadly threat.

For the first *Larsen* factor, the record establishes that Eguino-Alcala failed to comply with Deputy Ortega's urgent orders. During their encounter, Eguino-Alcala positioned himself so that he blocked his right arm and hand from the deputy's view. Deputy Ortega had ample basis to be concerned that

13

Eguino-Alcala was armed. When Deputy Ortega ordered Eguino-Alcala to "get on the ground" and "put your hands up," Eguino-Alcala failed to comply with either command.[8] BN 5397 at 0:00:12–0:00:20. Instead, he maintained his worrisome posture, hiding his right arm and hand near his waistband. *Id.* at 0:00:13–0:00:18; App. vol. I, at 104, 237; Ortega Dep. at 0:28:37–0:29:12. After about a six-second standoff, Eguino-Alcala quickly twisted his body to face the officer while extending his right arm and pointing his finger as if a gun. BN 5396 at 0:00:05–0:00:24; BN 5397 at 0:00:20–0:00:21; BN 5399 at 0:00:10–0:00:14; Ortega Dep. at 0:29:12–0:29:40. In those circumstances, especially when alerted earlier that Eguino-Alcala may have a firearm, any reasonable officer would fear a drawn firearm.

The Estate argues that a jury could conclude that Eguino-Alcala lacked sufficient time to obey Deputy Ortega's repeated commands. But Eguino-Alcala disobeyed for a full six seconds before making his sudden threatening movement. The dashcam video defeats the Estate's assertion that Eguino-Alcala "moved to comply with commands to raise his hands." Op. Br. at 48; *see* BN 5399 at 0:00:10–0:00:14. A jury could not reasonably interpret Eguino-Alcala's

---

[8] The Estate claims that Deputy Ortega confused Eguino-Alcala "by barking contradictory orders." Op. Br. at 21. But we fail to see how an order to raise his hands conflicts with an order to get on the ground. The Estate also argues that Deputy Ortega "should have realized" that Eguino-Alcala "may struggle to immediately comply with confusing orders, because he could be dazed, injured, mentally unwell, or otherwise impaired" from the car crash. *Id.* But that possibility takes a back seat to the deputy's legitimate fear that he was about to be shot.

sudden upward twist toward the officer and movement of his right arm as an attempt to raise his hands and get on the ground.[9] For these reasons, Deputy Ortega met *Larsen*'s first factor, which supports an immediate threat. *See Est. of Taylor*, 16 F.4th at 766 (concluding the first *Larsen* factor supports a finding of an immediate threat when the suspect repeatedly refused to comply with orders, even absent a visible gun).

The second *Larsen* factor pertains to hostile motions from the suspect. As discussed above, Eguino-Alcala's hostile motion caused Deputy Ortega to reasonably fear an immediate and deadly threat. *See id.* at 767–68 (concluding that an officer reasonably shot an unarmed suspect in part because the suspect rapidly, and without warning, "withdrew his right hand from his waistband . . . consistent with the drawing of a gun"). A reasonable officer could have believed that Eguino-Alcala's actions placed the officer under "mortal threat of gun violence, even if that judgment ultimately was mistaken." *Id.* at 768. In fact, as the video shows, Deputy Ortega's split-second decision may well have

---

[9] The Estate's citations to *Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022), *Emmett v. Armstrong*, 973 F.3d 1127 (10th Cir. 2020), and *Kailin v. Village of Gurnee*, 77 F.4th 476 (10th Cir. 2023) are unavailing. In those cases, the plaintiffs presented admissible evidence to support a version of events in which the officer faced no immediate serious threat. *See Finch*, 38 F.4th at 1241–42 (concluding that the video of the suspect raising his hands did not blatantly contradict the plaintiff's assertion that his actions were nonthreatening); *Emmett*, 973 F.3d at 1135 ("The video footage arguably could support either [the suspect]'s version of events or [the officer]'s version of events."); *Kailin*, 77 F.4th at 482 ("Jurors could interpret many things from what they see or do not see in those six seconds.").

saved his own life had Eguino-Alcala really possessed a firearm—Eguino-Alcala's quick move put him in position to shoot Deputy Ortega. *See Est. of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1060, 1064 (10th Cir. 2020) (noting our circuit's "particular[] deferen[ce] to the split-second decisions police must make" and that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences" (internal quotation marks omitted)). Without Deputy Ortega's quick reaction, had Eguino-Alcala indeed been armed, he may well have beaten Deputy Ortega to the first shot. We cannot "expect any human being to remain passive in the face of an active threat on his or her life." *Id.* at 1064 (internal quotation marks omitted).

As its sole evidence that Deputy Ortega unreasonably used deadly force, the Estate relies on Deputy Ortega's dashcam footage to argue that a reasonable jury could find that Deputy Ortega fired his weapon *before* Eguino-Alcala's sudden movement. But as earlier set forth, the dashcam video shows the opposite.[10] By Frame 17218 of Deputy Ortega's dashcam footage, Eguino-

---

[10] The dashcam video shows Deputy Ortega firing nine shots at Eguino-Alcala, with the first shot occurring after Eguino-Alcala had already begun quickly turning toward Deputy Ortega. BN 5399 at 0:00:11–0:00:12; *see also* BN 5396 at 0:00:23 (showing Eguino-Alcala's extended arm from the perspective of Officer Jason Hayes's dashcam). And as further confirmation, we see nine cartridges being expelled after the first gunshot. BN 2787 at 0:09:35–0:09:38; BN 5399 at 0:00:15 (first cartridge at Frame 17236), 0:00:16 (second cartridge at Frame 17243), 0:00:17 (third cartridge at Frame 17249), 0:00:18 (fourth cartridge at Frame 17257), 0:00:21 (fifth cartridge at Frame 17267), 0:00:22 (sixth cartridge at Frame 17274), 0:00:24 (seventh cartridge at
*(footnote continued)*

Alcala had started to twist his body upward and extend his arm and index finger. BN 5399 at 0:00:11. And the first gunshot from Deputy Ortega doesn't occur until after Eguino-Alcala's sudden twist.[11] *Id.* at 0:00:13. Qualified immunity protects these types of split-second decisions, as long as the decisions are reasonable.[12] *See Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) ("The reasonableness of an officer's conduct must be assessed from the perspective of a reasonable officer on the scene, recognizing the fact that the

---

Frame 17282), 0:00:27 (eighth cartridge at Frame 17298), 0:00:29 (ninth cartridge at Frame 17309).

[11] A possible first gunshot sound occurs at Frame 17221. BN 5399 at 0:00:12. Another possible first gunshot sound occurs at Frame 17226. *Id.* at 0:00:13. The cartridge from the first gunshot indisputably appears at Frame 17236. *Id.* at 0:00:15. In view of the timing between the succeeding gunshots and the appearance of their associated ejected cartridges, it appears likely that the first gunshot is heard at Frame 17226. But viewing the facts in the light most favorable to the Estate as the nonmovant for summary judgment, we take the first gunshot as occurring at Frame 17221. *Id.* at 0:00:12.

[12] We disagree with the Estate's argument that a frame-by-frame examination of the dashcam footage necessarily falls in the jury's province. Our frame-by-frame examination of the video disproves Eguino-Alcala's version of events, leaving no genuine dispute of material fact for the jury to resolve.

We also disagree with the Estate's assertion that the district court "misapplied *Scott v. Harris*," 550 U.S. 372 (2007). Op. Br. at 13. The Estate claims that "courts may not rely on their own interpretation of video evidence unless the nonmovant's facts are blatantly contradicted by the video." *Id.* at 10 (internal quotation marks omitted). But here, the Estate cites *no evidence* except the video to support its version of events. So the district court reviewed the video evidence to determine whether that evidence properly supported the Estate's factual assertions. *See Helvie*, 66 F.4th at 1235–36. And we agree with the district court's conclusion that it does not. *Alcala*, 2023 WL 7222867, at *5.

17

officer may be forced to make split-second judgments under stressful and dangerous conditions." (internal quotation marks omitted)). Because the Estate cites no other evidence to support its assertion that Eguino-Alcala twisted his body in response to the shooting, we discern no genuine dispute of material fact on this issue.[13] *See Helvie*, 66 F.4th at 1235–36. The video evidence makes clear that Eguino-Alcala turned before Deputy Ortega's first shot.[14]

The Estate also argues that "a jury could conclude that [Deputy] Ortega could see [Eguino-Alcala]'s hands and, therefore, could not have reasonably believed [Eguino-Alcala] was reaching for anything inside his pants." Op. Br. at 18. But the Estate provides no support for this factual assertion. Its citation to Deputy Ortega's deposition creates a misleading impression that Deputy Ortega saw Eguino-Alcala's empty hands before he fired. *Id.* at 18, 24 (citing Ortega Dep. at 0:29:25–0:30:24). Rather, Deputy Ortega testified that he did

---

[13] The Estate points to Officer Hayes's deposition testimony after being shown the dashcam video in arguing that a reasonable jury could find that Deputy Ortega shot before any movement from Eguino-Alcala. But during oral argument, the Estate clarified that Officer Hayes watched only the real-time video, not the slow-motion video. Oral Argument at 0:06:20–0:07:06. As stated, the slow-motion video shows that Eguino-Alcala had turned before the first shot.

[14] The Estate claims that a genuine dispute of material fact exists based on Deputy Ortega's explanation that "he thought he heard a gunshot." Op. Br. at 15. We disagree. Deputy Ortega could have mistakenly believed that he heard a gunshot and also reacted to Eguino-Alcala's turn. The two are not mutually exclusive. But because Deputy Ortega reasonably believed that Eguino-Alcala was armed and had brandished a firearm at bystanders, we view the sudden draw-like movement as dispositive on the question of reasonableness.

not see a gun but saw that Eguino-Alcala "was going to pull something out." Ortega Dep. at 0:29:55–0:30:25. He further testified that the shooting happened "so fast" that he "couldn't tell whether there was a gun or there wasn't a gun," and that he "wasn't going to wait for [Eguino-Alcala] to show me—pointing a gun towards my face." *Id.* at 0:30:25–0:30:40. Without any evidence to support the Estate's factual assertion, this argument fails.[15]

---

[15] We pause here to address some of the Estate's arguments in its appellate briefing. The Estate argues that Deputy Ortega also "claimed that he could not see either of [Eguino-Alcala]'s hands." Op. Br. at 18 (citing App. vol. I, at 236–37). But the cited portion of Deputy Ortega's deposition does not support this assertion. Instead, Deputy Ortega testified that "[o]ne hand is down on one knee and one is over here." App. vol. I, at 236–37. In the deposition video, Deputy Ortega modeled Eguino-Alcala's position by resting his left hand on his left knee and keeping his right hand out of view but near his waist. Ortega Dep. at 28:33–29:10. The Estate also complains that at one point, Deputy Ortega testified that Eguino-Alcala's right hand "was merely 'near' the waistband." Op. Br. at 18. We do not see how this testimony contradicts other portions of his testimony, which have consistently conveyed that Eguino-Alcala's right hand was on or near the waistband. Last, the Estate cites Deputy Ortega's declaration and testimony, in which he twice stated that he could not see Eguino-Alcala's right hand. App. vol. I, at 104, 241. Again, a closer inspection reveals that the evidence does not support the Estate's description. The declaration says that Deputy Ortega "could not see Mr. Eguino-Alcala's [right] hand, because it was blocked by his torso, but [Deputy Ortega] could see that his right hand was in or near [his] waistband." *Id.* at 104. At the deposition, Deputy Ortega testified that he could not see Eguino-Alcala's right hand but could tell that the right hand remained waist-level from the position of Eguino-Alcala's body. *Id.* at 241. Dashcam footage from Officer Hayes corroborates his testimony. BN 5396 at 0:00:06 (showing Eguino-Alcala's right elbow bent along the right-side of his torso and his right hand near his waist); *see also* App. vol. I, at 107 (Officer Hayes's declaration stating that Eguino-Alcala was "in a crouched position with a hand near his waistband"). In sum, we agree with the district court's finding that Eguino-Alcala placed his right hand in or near his waistband before the shooting.

The Estate then asserts that Deputy Ortega "had no reason to suspect [Eguino-Alcala] was concealing a firearm." Op. Br. at 18. It cites Deputy Ortega's OIS Interview, during which he testified that he did not hear any dispatch reports about a rifle. *Id.* at 17 (citing OIS Interview at 21:09–21:21[16]). We agree with the Estate that what matters is what Deputy Ortega knew by the time he shot his firearm, not what dispatch had reported before that. *Cox v. Wilson*, 971 F.3d 1159, 1166 (10th Cir. 2020) ("[T]he only evidence relevant to the propriety of [an officer]'s actions is what [that officer] observed or what he was informed of by others."); *see also Graham*, 490 U.S. at 396 (requiring that we judge reasonableness "from the perspective of a reasonable officer on the scene"). So without more, the dispatch reports insufficiently show that Deputy Ortega knew about the rifle.

But Deputy Ortega had information beyond any dispatch reports. As Deputy Ortega stated in his OIS Interview, bystanders at the automobile-accident site told him that Eguino-Alcala had a firearm. OIS Interview at 0:02:41–0:03:37, 0:10:47–0:11:38. He testified that several bystanders had yelled words to the effect of, "He has a gun, he's running that way." *Id.* at 0:11:27–0:11:36. He also stated that an older man approached him at the accident site to tell him that Eguino-Alcala had pulled a gun, pointed it at

---

[16] We believe the Estate cited an incorrect portion of the OIS Interview and had intended to cite the portion at 0:10:11–0:10:37.

people, and then ran down South Main Street before taking the first right.[17] *Id.* at 0:02:41–0:03:37, 0:11:10–0:11:24. Deputy Ortega testified about these matters in his deposition as well—including that the man who approached him at the accident site had told him that Eguino-Alcala "had a gun." App. vol. I, at 239. The Estate does not dispute the testimony from the OIS interview or the deposition on appeal.

The dashcam video also establishes that he knew about Eguino-Alcala's involvement with a firearm. After visiting the automobile-accident site, Deputy Ortega radioed other officers about "a possible 10-80 [a firearm]" as he searched for Eguino-Alcala. BN 2787 at 0:06:10–0:06:20. The record establishes that Deputy Ortega knew about a potential firearm by the time he confronted Eguino-Alcala. So the Estate's attempt to create a disputed fact falls short. Deputy Ortega could reasonably have believed that Eguino-Alcala was armed during their encounter. The second *Larsen* factor weighs in favor of an immediate threat.

For the third *Larsen* factor, the Estate argues that a thirty-five-foot distance between Deputy Ortega and Eguino-Alcala does not support using deadly force. Again, we disagree. We have held that this factor favors an

---

[17] Deputy Ortega's dashcam video is consistent with his testimony from the OIS Interview. The video-audio shows Deputy Ortega talking to the older man, and audio captures the older man or another bystander proclaiming that Eguino-Alcala has a gun. BN 2787 at 0:05:21–0:05:24. Deputy Ortega's conversation with the older man is inaudible in places. *Id.* at 0:05:23–0:05:25.

immediate threat at twenty feet if the officer lacks cover and reasonably believes the suspect wields a knife or a gun. *Palacios v. Fortuna*, 61 F.4th 1248, 1260 (10th Cir. 2023) (concluding that this factor supports an immediate threat at fifteen to twenty feet, if the officer lacks cover, for a gun-wielding suspect); *Est. of Larsen*, 511 F.3d at 1260–62 (same at seven to twenty feet for a knife-wielding suspect). By contrast, we have determined that fifty feet, if an officer has cover from a gun-wielding suspect, does not support an immediate threat. *Pauly*, 874 F.3d at 1218. With these guideposts in mind, we conclude that the distance of thirty-five feet between Deputy Ortega and a potentially armed Eguino-Alcala supports an immediate safety threat.[18]

The Estate's citations to *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) and *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989) provide it no help. Both cases involved suspects who wielded knives rather than firearms. *Walker*, 451 F.3d at 1159–60 (shooting a knife-wielding suspect may be excessive when the suspect was at least twenty-one feet away from the officer); *Zuchel*, 890 F.2d at 275 (same when the suspect was ten to twelve feet away and neither charged nor stabbed at the officer). All else equal, we decline to treat the level of danger from a knife-wielding suspect as equivalent to that of a

---

[18] In the district court, the Estate cited a distance of "approximately 30 to 35 feet" between Deputy Ortega and Eguino-Alcala. App. vol. I, at 193. The district court assumed that the distance was thirty feet and determined that this distance supported an immediate threat. *Alcala*, 2023 WL 7222867, at *8. On appeal, the Estate refers only to thirty-five feet as the distance between Deputy Ortega and Eguino-Alcala.

gun-wielding suspect. *See Est. of Ceballos v. Husk*, 919 F.3d 1204, 1216 (10th Cir. 2019) (stating that a suspect armed with a firearm—"capable of harming someone from a much greater distance and with greater lethal potential"—provides a "stronger justification for [a] police shooting" than a suspect armed with a pocketknife). For these reasons, the third *Larsen* factor favors an immediate threat.

And last, the fourth *Larsen* factor—the manifest intentions of the defendant—supports a finding of an immediate threat. Before their encounter, Deputy Ortega reasonably believed that Eguino-Alcala brandished a firearm at bystanders, fled the scene of the car crash, and was potentially armed. Upon initial contact, Eguino-Alcala obeyed Deputy Ortega's order to stop. But that compliance ended when Deputy Ortega ordered Eguino-Alcala to put his hands up and get on the ground. He did neither. Instead, he hunched over and placed his left hand on his left knee while his right hand remained by his waistband. And most crucial to signaling his intentions, Eguino-Alcala suddenly twisted his body up in a motion reminiscent of drawing a gun. These circumstances suggest to any reasonable officer that Eguino-Alcala posed an immediate threat.

Because all four *Larsen* factors point to an immediate threat, the second—and most important—*Graham* factor supports Deputy Ortega's use of deadly force.

### B.  *Graham* Factors One and Three: Severity of the Crime & Resisting or Evading Arrest

The Estate also challenges the district court's rulings on the first and third *Graham* factors. These factors are close calls. But even if we were to assume that both factors weighed against Deputy Ortega, they cannot overcome the strength of the second *Graham* factor. *See Est. of Taylor*, 16 F.4th at 763–77 (concluding that an officer reasonably used deadly force even when the second *Graham* factor alone favored the officer). Deputy Ortega reasonably perceived an immediate and lethal threat to himself; that threat surpasses any argument in favor of the Estate under the first and third *Graham* factors. We conclude that his use of deadly force was reasonable under the totality of the circumstances.[19]

In finding no Fourth Amendment violation, we hold that qualified immunity bars the Estate's claims under § 1983. The undeniably tragic events make any ruling a difficult and unsatisfactory one. But "[t]he Constitution

---

[19] The Estate briefly argues that "[a] reasonable jury could conclude that [Deputy] Ortega's reckless and deliberate conduct unreasonably created the need for deadly force." Op. Br. at 29; *see id.* at 48. But this argument relies on a litany of factual assertions that we have already found immaterial or insufficiently supported by the record to create genuine disputes of material fact. *Id.* at 30 (stating that Eguino-Alcala "may have been impaired" from the car crash and that Deputy Ortega "had no reason to believe [Eguino-Alcala] . . . was armed"). Though we remain cautious about granting summary judgment based on solely the officer's testimony in deadly force cases, we still require the nonmoving party to "proffer sufficient circumstantial evidence from which a reasonable jury could find" for that party's version of events. *Helvie*, 66 F.4th at 1235. And here, the Estate failed to do just that.

simply does not require police to gamble with their lives in the face of a serious threat of harm." *Est. of Valverde*, 967 F.3d at 1063–64 (internal quotation marks omitted). We will not force officers to "wait until they see the gun's barrel" before using deadly force. *Est. of Taylor*, 16 F.4th at 747.

## CONCLUSION

We affirm the orders dismissing the § 1983 claims and the final judgment.